Thank you. I think Council is all familiar with the lighting system and procedures and so forth, so why don't we proceed then to Conocophillips v. United States, number 07-5004. Mr. Burke. Let me please the Court. This case presents two questions, two principal questions. First, whether under Bar 16-203 the government may set adjustable prices without regard to changes in established market prices. And second, whether Conocophillips has waived its claim to challenge the government's adjustable prices by waiting too long to seek a legal price. We'll take each on established market prices. Established market prices are defined— Mr. Burke, before you get into the merits of your, we'll call it the PMM issue, the Conoco case, does the Conoco case raise the minority preference issue? It does, Your Honor, in the sense that the context of waiver, and if we are correct in our assertion that these violations of law cannot be waived, then I believe that that holding of the Court would fall. Well, that wasn't presented as an issue with respect to the minority preference question in Conoco. I understand that it was in LaGloria, but the only place I saw any reference, other than in the facts, to the argument with respect to the applicability of waiver or the merits of the minority preference was in a footnote on page 50 to 51, which I question whether that raises the question of the minority preference, the validity of the minority preference, or the validity of the waiver with respect to the minority preference for purposes of Conoco, setting aside for the moment LaGloria. Well, Your Honor, we're, of course, limited in the amount of space that we have in our brief. I think under this Court's precedent, the Court would certainly have the discretion to consider that issue even were it to choose to do so. Again, we're not arguing the merits of the minority price preference in Conoco because that was not addressed by the Court. Rather, we are simply raising the issue there of waiver, and as part of our broader argument that violations of a law in awarding contracts cannot be waived, we would assert that the lower court erred in holding the minority price preference. Is Judge Bryson correct that the waiver issue was not raised in the text of the brief? It was only raised in that footnote 24? The waiver of the minority price preference, Your Honor, yes, it was only raised by footnote. Let me just ask a sort of related but different question about that. Judge Reese divided this up and has a section called small business and the minority set-aside programs. On the small business auction stuff, he really seems to have, in my view, decided this on the merits. Now, you would agree, would you not, to the extent you're arguing that anything was, even if we agree with you that the footnote preserves something, the only thing preserved is the minority set-aside. In other words, you have not preserved, because you have not appealed, his determinations with respect to the small business auctions and so forth. I think that's a correct characterization, Your Honor, yes. Why don't you go ahead? Proceeding with the FAR 16-203 issue, again, FAR 16-203 permits the government to set adjustable prices based on changes in established market prices. Established market prices are defined in the FAR to be prices set in the ordinary and usual course of trade between willing buyers and sellers. That definition, we argue, is essentially synonymous with the standard of fair market value. Here, of course, the government set prices using the PMM. The PMM is an index of prices that was neither designed to measure changes in fair market value, nor, in fact, did it measure changes in fair market value, and that is a fact which I think, on this motion to dismiss, we are entitled to a finding concerning it. I guess in 203, it says that prices are to be established based on published prices for specified items, correct? That's correct. And why isn't, I mean, the agreement that you reach specifically says that the prices are going to be established based on the items specified in the PMM, correct? That's correct. So what am I, I mean, it seems to me one leads you to, you know, it fits within 203. What am I missing? Well, you know, I think the language in FAR 16-203A1 talks about agreeing to a agreed-upon measure of changes, but a measure of established market prices. So I think what I would add to what you have said is it's not only an agreed-upon standard, but an agreed-upon standard of changes in established market prices, and that definition of established market prices, or that term established market prices, the court in Tesoro went to some length to articulate, was defined in turn by FAR 15-804-3, so that that definition of established market prices is incorporated into FAR 16-203, and I think that was the premise upon which the court in Tesoro declined to adopt the reasoning map. I should probably know this because we've had several of these cases, but I'm still a little unclear exactly how one goes about, in your view, properly identifying the market price of military-grade fuel. Well, for purposes of measuring market value. Well, for purposes of measuring market price in order to determine what ought to be in compliance with the FAR's requirements, as you see it. Well, Your Honor, again, I think the standard in our view is one of fair market value. Well, I understand, but how do you get there is my question. And here I think the easy answer, as our experts have identified, is to use the index that everyone now agrees is appropriate. The government uses PLAS as its index now. They stopped using the PMM in 1994, and we agree and allege that that is an appropriate measure of fair market value. But where does that come from? What is that in turn measuring? Well, it is in turn measuring what willing buyers and willing military-grade fuel are in the case of buyers. One, I take it. I couldn't go down to my local gas station and ask for either regular, high-test diesel, or military-grade. I mean, presumably the only people buying military-grade in the United States is the military, right? Well, Your Honor, the FAR, I think, answers that question when it draws the distinction between standard supplies and semi-standard supplies. The FAR permits price adjustments for standard supplies, which is essentially an off-the-shelf type item. Analogous here would be on metagasoline, or semi-standard supplies, which are reasonably related to a standard supply. And so here, I think we would be in the context of a semi-standard supply, military jet fuel, which is reasonably related to the price of military jet fuel. But isn't that where you have to start doing some constructive determination of price? In other words, well, let's go back to it. Tell me how it is that the agreed-upon market measure is determined. How is that measured? How is that calculated? The validity of the market measure, I think, or the standard against which I would argue should be measured, is the standard of I'm trying to get at, tell me what is the mechanism by which that market value is calculated? Well, in this case, we would allege that it is appropriately calculated by PLAS, which is a commercial pricing service, which talks to people and says, what are you paying? What are you offering? What is the agreed-upon price? But presumably, the people that it talks to with respect to military-grade fuel is the government. Well, actually, your honor, there is not a PLAS for military-grade fuel, or for that matter, for the PMM for military-grade fuel. Again, we're looking at commercial fuel as the benchmark, as the non-standard supply that everyone agreed could be used as the benchmark for military fuel. But that's a proxy for this fuel, isn't it? That's certainly true, but that's true of any case where under the FAR, you have price adjustment for a non-standard supply. I don't think there's anything unique here. I mean, the government routinely does that when they're buying a government good that is similar to a market good. They use the price, the market price of the market good, the commercial good, as the benchmark. So I don't think there's anything at all unique here, or any great dispute over that. Well, I guess what I'm having trouble with, and don't worry about your time, because we're pestering you with questions. We'll give you enough time to make your argument. But if we asked, what is the market value of a tank, a Sherman tank? Well, it's what the government happens to pay for Sherman tanks under contracts with providers of tanks. You can't go out and find a market for Sherman tanks. So I'm having trouble seeing why there is an easily ascertained market price for the particular product that's at issue here, against which to say, well, the PMM clearly doesn't establish market price, because it's a construct that's put together with several different components that doesn't reflect the actual market price, if there is no market. Well, I don't believe you could use an economic price adjustment clause based on established prices to buy a tank. There's no non-standard supply that you could, if you might think about the point now, could use as a meaningful marker. But here, there are meaningful markers, and the parties have agreed that there were meaningful markers. So I think you can't, to take your example one step further, we couldn't have an established market price for aircraft carriers. You just can't use that type of price adjustment clause to buy an aircraft carrier. Here, however, I think the parties' contracts and their courts of conduct would clearly show that you can use a commercial fuel as a non-standard supply to measure the changes in market value of military fuel. And so the principal concerns here with regard to the PMM are not so much that on the one hand, PMM is largely reflecting commercial fuel, although there is some military fuel in there. It's not the issue, is it a standard supply versus a non-standard supply? The issue with the PMM is that it doesn't even measure what it purports to measure, if it even purports to measure a fair market value. Interestingly, the people who published the index have never come forward and said, this was designed and intended to measure market value. The EIA, the group within the Department of Energy which published it, has never come forward and said, you know, we designed this to measure market value, and it does that, and the record is completely silent here. But it is an indicator of market value, albeit one that's factors in addition to price. And in that sense, what is to suggest that that's not exactly what the party's intended? Well, let me offer this example as a simplified explanation, but I think it makes the point. If you were measuring the market value of a basket of food, eggs, milk, and bread in one month, and you take one of each and put it in the basket, and you get an average price, and then the next month you take a basket of food which has eggs and milk but no butter, and you take the average price of that. If you compare the two averages, average price of food, from one month to another, that calculation tells you absolutely nothing about the changes prices. You don't have the same goods in the basket from month to month. So whatever you may be calculating, if it is even an average amount spent that month, comparing it from one month to the next tells you absolutely nothing about the change in prices. What it tells you is how one month you didn't have butter in the basket, and the next month you did. I'm not sure it's fair to say it tells you absolutely nothing. It may not be a precise indicator, and it may not vary even in direct proportion. I think there's a nice example set out in the briefs here about how the price of fuel can go actually down in two different markets, and the average price can go up because the volume factor. But notwithstanding that, if you look at the experts' spread, the bar graph, it seemed to me there were some times when this PMM index worked to the government's advantage. There were other times it seemed to work in the contractor's advantage. And certainly it has as a component a price, the price of fuel. And what's to suggest that that's not exactly what the parties intended? Well, I think with regard to the FAR 16-203 claim, the question is not what did the parties intend, but what does the law require? Here we would submit that an index that varies inversely with the marketplace in some years as much as 33 percent of the time simply doesn't pass the market test that the law provides. I would point out that we are on a motion to dismiss here. We have alleged in the complaint that the PMM does not reflect the marketplace. If we want to get into the issue of whether the PMM does or does not really reflect the marketplace, we're more than happy to do that, but we want our opportunity to put all the evidence in, and I'll let the courts decide that. But I do think that on this record we are entitled to an inference for purposes of issues here that the PMM does not reflect the market value of fuel, and it would be our view that that does not establish or meet the standard that the prices need to affect prices in the ordinary course, ordinary and usual course of trade. Thank you. Thank you very much. I just wanted to go back to where we started kind of, which is on the question of waiver, not the waiver. Assuming that we accept that you've properly raised the issue of the equal protection allegation in your brief, then you're left with Judge Weese, who kind of decided that I'm going to stop a waiver kind of issue. And it seemed to me Labarge, which also has some relevance to your argument in LaGloria that deals with lack of subject matter jurisdiction, also, I mean in Labarge and other cases, it seems like at least some of the cases there was a reason why the person didn't raise it in a way that they were not aware of what was going on in the preference in the auction or whatever it was in a particular case until some later point in time. And here that's not the case, correct, as a factual matter. I mean your client knew what was going on on the small business set-asides from the get-go, right? With regard to the small business set-aside, yes, Your Honor, that was certainly the case. Right, and that's all that's left here, right, on the equal protection claim, is those preferences. So that's, so he did know. Do you, what are your best cases or what case would you rely on that's clear where the person in that case also clearly had knowledge at the very start but is still allowed to preserve his claim and not to have a stop or fly? Well, again, looking towards the minority price preference issue and some broader issues there, obviously, as well, too. I mean a very good case, I think, would be Bates Systems where the contractor came in and said, we should use a different index here as part of the contract negotiation. And the government said, no, we're not going to use an index, and they went ahead and went forward with the contract. And the court of Bates Systems, I think, established the rule, also set forth in Crisper and Labarge, that where a contract is entered in violation of a law or regulation that protects the contractor. Right, I mean that's true, but I guess the problem I'm with Labarge is there at least is some of the language is broad in Labarge, but there is some reference to the fact that the contractor didn't know about this at the get-go. And so I thought that was arguably distinguishable from our case here. In Labarge, I think that's correct, although I think there is a difference. I don't think that distinction holds up for purposes of Bates Systems where they did know. Indeed, in Crisper, they raised the issue of the mistaken bid before they entered the contract. The government said, take it or leave it. The contractor took it and was still permitted then to come back and pursue a claim. The standard that the lower court applied here on waiver, the notion of failure to protest in general, in our view, not only runs against the express language of a number of the court's decisions where it says failure to protest is not a bar, it also sets up a... Although to be fair, we seem to have a virtually equal number of cases which seem to say the contrary. There is a division of authority there, and I would be pleased to address distinguishing those cases, but on the fundamental issue of what is the import of a rule that says if you fail to protest, waiver applies as a practical matter, gets us into a kind of catch-me-if-you-can approach to illegality. If the contracting officer is able to get a violation of the law in the solicitation, people don't protest either because they're afraid they'll be denied the contract when it gets down to an evaluation and be held against them. It almost gives them an incentive to sort of play, as I say, catch-me-if-you-can with illegality. But is there any limit here then? I mean, your client here knew about whatever problem you're alleging now under equal protection for the minority set-asides was well known from the get-go. Your client didn't say anything, we've got the contract, he lived through the contract. I mean, is there any temporal limitation to when your client can bring this equal protection claim? When it's a violation of law, I think the only applicable temporal limitation would be that of a statute of limitations, and I would offer the following reasoning. If the parties to this contract had gotten together and said, in the contract, we agree that the Fifth Amendment will not apply here, effectively it might be rewriting the prohibitions of the Fifth Amendment equal protection. In my view, I don't think that could be upheld. I think an express statement in the contract by the parties, we are exempting ourselves from the law, I think as a matter of policy, would have to be struck down, because the parties would then be knowingly and intentionally contracting around the law. And I would argue if an express agreement to contract around the law, and the amendment I've identified, if that could not support waiver, then I would argue, some sort of implied waiver can't be upheld on what is a lesser showing than an express agreement. And again, I think the reason for that fundamentally really comes from the Estaco cases in OPM versus Richmond, is the notion that the parties cannot contract around the law. That's simply not a permissible policy. Like the Supreme Court said in Kaiser's deal, if we permit that, then the rules of illegality would become ephemeral. Let me ask you, I understand on the facts of LaBarge, how damages were calculated, because in that case, if I've got the case right, I think it's the auction case, there was a disclosure of price, which resulted in a lower price, and the argument made and that succeeded was, let's go back to my first price, before the improper revelation of the price. But with respect to the 10% minority preference, how would you calculate damages in a post-performance setting? Well, you know, again, lacking a record on that, I wouldn't want to ask the question, it's because I have a hard time seeing how you would go about having any prayer of coming up with any kind of sensible damages determination. It feels like something that cries out for determination at the outset, through an injunctive action or a protest, so that the problem is dealt with at the front door as opposed to trying to sort it out at the end of performance. Well, certainly one of the relevant considerations, as LaBarge puts out, is does the violation in the solicitation process cause the contract price to be illegally diminished? So I agree with you that we have to look at that. I mean, we can't just have an illegality in the air with no impact on the contract. I think the standard LaBarge announces, is there a causal effect? Has it somehow diminished the contract price? The notion there being that while you may have been able to file a bid protest, if the government diminishes the price by an illegality in the solicitation, you still have a separate and independent claim for a lawful price, i.e. the government doesn't get the benefit of an illegal price really because nobody caught it in the solicitation process. Now, more specifically with regard to your question, how would you measure it? Again, I'm going to bind myself. Of course. I'm looking just for sort of general guidance as to what your approach would be. As I think was adopted in Barrett, that the price was illegal and unenforceable, and from there we go to a quantum error, quantum validate type record, which again asks the question of fair market value. So it's not somebody trying to take advantage and get a super market price or collect their costs when the market price was well below that. It's a price, I think the remedy there is all right, the price is illegal, we can't enforce it, we're going to be fair to everybody, and we're going to give you a fair market price. Here a fair market price would be not unlike that in an antitrust case when you ask what would the price of the marketplace have been but for the violation of the law. Other possibilities of course could also be, you know, if hypothetically you could show that the contractor was forced to reduce his price by 10% and but for the violation of the law his price would have been 10% higher, query whether that might be an appropriate measure. Again, I'm a little bit hesitant in the absence of a record to speculate too far on how dangerous might be, but I think the fundamental point here is that there is very substantial authority in this court that where there is an illegality in the award of a contract, the contract and that illegality has impacted the contract price, that the contractor is entitled to pursue a claim to recover a lawful price. Just one point of clarification. You mentioned the statute of limitations. Judge Weiss, at least with respect to the PMM waiver issue, I think noted it's been going on for 17 years. Did I read somewhere that there there is now a statute of limitations whereas there wasn't at the time? That's correct, Your Honor. I believe 1995 FASA was enacted which established a six-year statute of limitations, but I think this court in its Motorola decision has made clear that that does not apply retroactively. For that reason, we would rely on the Louisville Railroad case where the Supreme Court, again involving the legality in the price of a contract, said that no act or omission of the parties could preclude the recovery of a lawful price save for the running of the statute of limitations. I think Congress, having made the determination that prior to 1995 that they would by far neither the government nor the contractor, calling that applies both ways, merely on the passage of time, I think that is a policy judgment that we would argue Congress has made applying it to both parties and that in effect what the court did here was to apply a traditionally written statute of limitations based in effect simply on the passage of time. Again, I come back to the notions of looking at both sides of this. I think were the government to come in here and say it was the refiners who had established an illegal price, you know, I don't think we would be asking the government, well, why didn't you just go to somebody else if you didn't like the price that you got? Or, well, a government hadn't been waiting too long. I think the law is very clear that the court says it's not an issue about how long you wait, it's an issue about whether the government paid a lawful price or not. If it didn't, it's entitled to a lawful price. I would submit that the same rules should apply here. The question is, was a lawful price paid or was it not? And if it was not, the government merely by the passage of time has no greater right to withhold a payment of a lawful price. It's interesting that in Barrett the court characterized these same types of prices as illegal and unenforceable. I would argue that with the passage of time, the prices don't somehow become less illegal or less unenforceable. Okay, well let me, and just let me, one follow-up to Judge Bryson's question about how we calculate damages in this context. If indeed your assertion that, well, maybe one way to do it is to look at the difference in what it cost your client, but doesn't, if we make that, if that determination is made, we don't know how many other people were bidders. I mean, there was no assurance. If we agree with your assertion about a violation of the equal protection and the set-asides, and we think the price should have been bumped up higher, how do we unring the bell without being, I mean, being able to go back to the get-go and know how the bidding would have gone, whether your client would have even gotten the contract, right? Well, Your Honor, it's a fair question, but I think it is a question that we confront any time we have an illegal price. Anytime that the violation of the law and the solicitation or award of the contract gives rise to an illegal price, any time is an overstatement. Many, perhaps most of the time, we're going to face that question. How do we go back and create a buck-full world for what the bid price would be? I think part of the answer to that is, and the Court's answer to that has been, that what we do is we apply an equitable remedy and we say, quantum error at a fair market value. And we're not going to try to go back, this is one approach, and try to parse how you might have bid because, you know, that could result in you getting a price that was well above market value. And the Court's answer is, we're not going to go back and parse that. Or somebody else having gotten the contract. That's right, that's right. And what we're going to do in the context of an illegal price is, rather than trying to create a buck-full world, it's just, look, the best we as the Courts can do here is to say, we're going to do equity, and equity in our view is fair market value. And, you know, whether your arguments on what you might have bidded is greater or less than fair market value, we're going to put that aside and we're simply going to give you value at the market price. In my view, that is the better answer in why, in fact, the whole notion of You've, we've barraged you with questions, but you've covered a lot of ground in responding to the questions. To be fair, since we've basically taken all of your time with questions, is there any point that you would like to make quickly that you haven't had an opportunity to make in response to the questions, and then we'll have to move on to hear from the judges. Just one quick point, if I may, with regard to the Court of Federal Claims standard in applying Part 16-203, which, in my view, has essentially said it doesn't matter whether the index reflects the marketplace. To me, that is problematic. It's a problematic standard for the entire procurement process. It is as likely next time around that it is the government which is going to come up substantially short by an index that does not reflect the marketplace. And adopting the Court of Federal Claims ruling here would mean that next time around when the government woefully overpays because the index shows it did not reflect the marketplace, that if that rule was applied, the government will be told that they don't have a claim. I would submit that that's not the better standard. The better standard and one that reflects the language of the FAR is it has to reflect market value. Thank you. Mr. Gillingham, we've gone considerably over, and you should feel free to take, I think we have about 15 minutes extra from Mr. Burt. Right, so if you need the time, in fairness, we'll offer it to you, but you should not feel a compulsion, an obligation to the Court to take it off if you don't need it. Thank you. May it please the Court that we understand that we are so close because the Court desires conversation in these matters, and I'm all too well aware that what I say is a large result, largely measured by your questions. As you see, Mr. Burt and I have large books with us, and we could read these for a long time, and we've filed lengthy briefs in these cases. Starting with the matter of the PMM, just responding to Mr. Burt's reply, there's nothing he said here today I think that we haven't already responded to. It really requires me to spend much of your time. He said that the flaw of our argument was that we failed to take into consideration the first prong of 15.804-3, which his Court told us in disorder 2 was really the definition, provided the definition for established prices. That is that established were those that were established in the course of ordinary and usual trade. Mr. Burt accused us of focusing instead on the second prong, which was that the prices could be verified from market sources independent of the contractor or vendor. But as is well established, the PMM, which is a measure of actual sales by energy producers in this country, is necessarily sales achieved in the course of ordinary and usual trade. So we frankly don't understand that point, and that's really the only one we've received with regard to our argument. We have argued also that this Court actually resolved the question for the Court today, both with respect to the PMM, by specifically endorsing the PMM as a legal price reference, and by extension to our arguments with regard to Platt applying the definition of established prices established by this Court in De Soro. Mr. Burt's brief, I should say Conoco's brief, points to a number of cases where we've spoken about the per se nature of that earlier proceeding, but Conoco's brief overlooks the fact that both parties spoke specifically about the nature of the PMM. In Conoco's brief, for example, they argued not only that that PMM was defective because it did not reflect the contractor's own prices. Conoco and its amici went on to say furthermore that in no sense could the PMM be regarded as something that reflects the market at all. The index number problem was referred to by the amicus as Judge Hewitt stated in LaGloria. That index number problem really boiled down to all the various factors that make the PMM the PMM, mainly the fact that it does take into account a large variety of patrolling products. However, for example, in this case Conoco sold JP5 and JP8. If you look at the very form EIA 782A that the Energy Administration, Energy Information Agency, asks or requires refiners like LaGloria to prepare, JP5 is a specific category for which it asked for fuel. So for example, sales of JP5 are not mixed with the sort of gasoline you might buy at the corner gasoline station. So there certainly are different types of fuel and the EIA 782A specifically asks for different types of fuel and therefore LaGloria understood when it said that the price reference would be the JP5 category, the PMM, what exactly was going to be the particular reference that would be whose rises and falls, the rises and falls of which would be gauged for the purposes of adjusting prices that the parties agreed to. We've also set forth in great detail in our brief the various explicit statements of the court specifically referring to the PMM. In fact, I can't conceive of a question whether it be characterized as one of law or a mixed question of law or fact that comes to this court without some factual context. We move for summary judgment below on the bare elements of the PMM. Everybody knew what it was and on those grounds alone this court found that in and of itself that whatever the PMM is, it did pass muster on the established prices provision of 16203-1. Moving on, in this case also Judge Ruiz had to deal with the allegation that there was a mistake in this case. The mistake by and large... Before we get to the mistakes, let me ask you about what Judge Bryson started with on the other side which is, I believe the government's red brief did not use now to preserve the waiver issue with respect to equal protection and small set-asides. What is the government's position on whether or not that footnote was sufficient to preserve that issue for appeal? I think you said that Ruiz's footnote was insufficient. Did you cover it in your brief? I didn't see it in your brief. I saw a reference in your brief to a different issue which was, you contended, was not preserved. I didn't see you addressing this. I don't know. I think Smith-Klein is the case we cited. I think that was a different issue. We certainly perceive that there was no appeal of any merits-based resolutions on the small business compliance. They generally fall into two categories, one being Fifth Amendment complaints that affect the price preference for small disadvantaged businesses. That appears to have been resolved in question of waiver, and so we did not address the merits there because Judge Ruiz did not. In the opening brief, we saw in a reference to it, Judge Ruiz did resolve on the merits of the small business set-aside. Right, and the other side didn't affect no option. But in the footnote, there is a reference to the illegal minority price preference as being one of the issues that Conoco seeks to preserve with respect to the waiver. And to the extent that it was, in fact, resolved only by the waiver, certainly we need to address waiver in our briefs. So what's the, I mean, do you feel, is it the government's position that that issue has been waived for purposes of appeal? The waiver issue has been waived with regard to equal protection for purposes of appeal because it was only contained in that one footnote, or is the government's view that it's up for grabs? To be honest, Your Honor, we made no special effort in our waiver arguments below or here to distinguish between waiver vis-a-vis small business and waiver vis-a-vis PNM. So perhaps you've waived the issue of waiver, the waiver issue. We'll leave that one to the court to parse, Your Honor. But if we do, if we do, so if we do reach the question of Judge Weiss's waiver, not the waiver on appeal, and the correctness of that, I mean, you know, there are cases, we have cases, Labarge and Beda and others that suggest that there is no waiver in this instance with regard to those questions. Correct? Well, I don't think it's true. That's certainly the way Conoco tends it. Furthermore, it's certainly true that the decision below can be substantiated or affirmed on any basis argued below, and certainly we've argued the merits below. Well, you've argued the merits on PNM. Right. On PNM, we argued them with regard to all small business allegations. Both the Fifth Amendment arguing the court had no jurisdiction should be dismissed according to 12b1, and with regard to the small business, same thing, that should have been dismissed under 12b1. We made the same argument in Conoco that we made in LaGloria, and we'll see in a moment when we get to LaGloria that Judge Hewitt actually addressed those on merits. So if, I can say this, if LaGloria would, if if Conoco in this case would have raised arguments in defense of a bar argument, we certainly would have responded. We certainly do believe the court can dismiss the court, dismiss the counts with regard to the Fifth Amendment and on small business exactly as we presented it below. The fact that, Judge, we selected to resolve it on different grounds, namely waiver with regard to the Fifth Amendment, and... Well, when you say how, excuse me, when you say how we resolved it below, are you talking about the subject matter jurisdiction basis of Judge Hewitt? Well, let's assume hypothetically that we don't buy into that one either. I mean, let's assume hypothetically that we were to reject the notion that big claims are adequately dismissed for lack of subject matter jurisdiction. Then the court would commit an error. Well, we'll talk about that later. I don't know whether you're invited me to tell you about that now. Would you like to talk about that? No. We should let the other side talk about it first, I guess. So I'd leave it for... You want to take it up within the context of the LaGloria case, the 12-1 emotional perspective of the Fifth Amendment claims? Sure. So we're moving on to mistake. In this case, Judge Ruiz dismissed the mistake claim under provision of Rule 56 because he considered documents. When you get moved to dismiss misuse or failure to state a claim, arguing basically that this was simply a repackaging of the claims with regard to the PMM. Those claims were that the PMM was illegal because the PMM itself failed to... It is not the price reference that is designed or intended is adequate to deliver a fair market price or did in fact deliver a fair market value price. Those allegations were the substance of the mistake claim as well. Generally, Concord Phillips complained that the parties had some mistake with regard to what the PMM actually was. In briefs, they discuss a mistake concerning the fact that the PMM was not in fact designed or intended to set prices. Mistakes with regard to whether in fact it would yield fair market prices. Our problem and the reason why we moved to dismiss for failure to state a claim was in fact the Gloria, I'm sorry, Conoco Phillips offered no evidence to that effect. What it did offer were conclusory statements written by Conoco officials. They were identical. It appears that the author had beta systems on one side of the desk and on the pen writing the declaration on the other because it attempted to track the beta systems language. Alleging, for example, specifically that in the understanding of the declarant, that Conoco Phillips did not intend to waive his right to fair market value. No details were supplied concerning what fair market value meant, how this intent was formed, whether the government had any such intent, or whether there were discussions with the government that might suggest there was a mistake of any kind concerning the nature of the PMM and whether it would yield what Conoco refers to as fair market value. So we said basically there's simply no evidence of any mistake. The allegations concerning the nature of the PMM and whether it was designed or intended to produce fair market value come from a deposition taken in another case well after the fact from a person who is responsible for the Energy Administration of Information's program, the PMM program, and he said when we designed this program we certainly didn't do it with the intent of creating a market price indicator. We did it for other reasons that Congress specified. Nonetheless, we have heard that the government and contractors find this to be a useful barometer of market value, but that certainly wasn't a hidden fact. It's inconceivable that the contractors of this size did not know what the PMM was. And it's clear that the government knew exactly what it was because in 1986 and 1987 we had before you robust discussions concerning the nature of the PMM and the nature of trade publications as DES struggled to determine which is the better reference to use for administrative purposes. I pestered Mr. Byrne about the facts, so in fairness I'll pester you as well. Can you give me a kind of working, maybe simplified version of what you see as the principal differences between the way the PMM is constructed and the way the OPIS and the PLATS numbers are constructed? One of the problems that we have in dealing with this is that if you don't have a really clear notion of what you're dealing with here, it's really hard to assess differences among these, and I'm still somewhat in the blue as to exactly how those three sets of numbers are put together, or at least if not exactly how in the dollars and cents and total details. Give me a kind of horseback sense of what the differences are in the way that one goes about constructing those three sets of numbers. Their general characteristics are compared in the 1987 study undertaken by by DPSC, which is on page 156 of Conoco Joint Appendix, but the PMM begins with the form EIA782A. Which is at page 827 of the appendix. It starts at page 827. Basically it asks, as is required by law, it asks energy producers to identify all their sales in the current month with regard to any variety of number of specified fuel products. And so these data are received by EIA, follow-up phone calls are made if they're not received timely or if there are corrections made, and ultimately three months later with all the data received, EIA issues a report saying with regard to these specific products, JP5 being one for example, these were the average price in a given state, a given region of the country. Now JP5, is JP5 equivalent to or is it exactly a military grade fuel or is this simply one that's used as a proxy for military spec fuel? This is the one that is very close to JP, Jet A. Jet A is commercial fuel. I understand that against the part of certain distillates that affect certain characteristics of it, but in terms of its basic additives, in terms of its basic refining, it doesn't affect Jet A. Typically in this case you're dealing with JP4, JP5, JP8. JP5 and JP8 are specifically identified in the EIA form so that companies that sell JP5 or JP8 are required to list their prices for those products. Okay now, what do the, I get the acronym wrong, OPAS and PLATS do differently that produce a different number? Because I take it that the PLATS, there's not much in the record frankly about OPAS, these are private services. My understanding of PLATS basically is that price analysts make phone calls and make judgments concerning what the price is. So for example, is there any systemic difference between the two? Well because it's judgmental, because it involves calling oil companies basically, mostly off the record now frankly. That's my understanding and asking them, what's your price today for, you name the product, and the company might respond, our posted price is X. The problem with posted price is the posted price may not be the actual sales price. So for example, if you maintain a supply station at the airport and some poor soul has to make a forced landing because he's out of gas and rolls up and says, what's the price of fuel for my plane today? The price is going to be the posted price. Come into the office and we'll look up the posted price. However, if a purchaser from United Airlines drives up as Mercedes-Benz and says, I'd like to buy, I'd like to sign a long-term contract, what's the price of fuel for American Airlines or United Airlines? That's going to be a different price because of the volume considerations and the sale. So why DSC, DSC explains these things. In their 1987 study, they reviewed various factors and one of them was the actual, which one actually best reflected the market and believed that it was the PMM because PMM, according to DSC, is the market. It actually is actual sales, not someone telling you over the phone, this is our price today. And that's one major factor. Now, Platzer's actually used as an interim price adjustment because PMM is only published three months after the fact. So you'll get a price for April, for example, for a specific region of the country or a specific state for a specific product. If you're waiting to adjust your product for PMM to tell you what the price was for April, you have to wait three months later until the data is collected and refined and the numbers are released. Well, oil companies can't wait three months for money having already supplied the quantity that we're talking about here. So the government, so the contract here permitted there to be an interim price adjustment and because Platz and Opus and some of these other so-called trade publications are issued much more frequently because they're tracked with PMM. Although there could be as much as a one or two cent change in any given month or disparity in any given month, that was sort of the best deal in town. And so DSC said, let's use these to set an interim price. Let's use Platz or Opus or your labor statistics, price references, or one group letter reviews in some cases, whatever it was. And by and large, it came down to what was available for specific markets. So in any event, these were used as interim price adjustments. But in the end, the PMM data was released. And at that point, an adjustment was made based upon what happened to the price reference in the PMM. Later, as Mr. Burke alluded to, in 1995, DSC decided to jump wholesale to Platz as the permanent, I guess we could say the permanent price reference, simply because it was too much administrative hassle to be constantly waiting three months for a price and then to adjust it and then have to make readjustments if there was an overpayment or an underpayment. Ultimately, DSC came to believe that Platz was close enough. And even though it had concerns that Platz did not actually state the actual market, it involves some judgment. Again, studies indicated it was that its own ability to attract sellers would not diminish and switch over to Platz permanently. Nonetheless, to the extent that there was any dispute about what the word market means in the term market-based prices, the parties by the behavior seem to accept that the market was, in fact, reflected in the changes of the PMM. Thank you. With respect to mistake, basically, arguments are, first, that simply, when we challenge the proof in this case, ConocoPhillips failed its burden by failing to put forward any evidence there was, in fact, a mistake. There are four elements of a mistake. First of all, both parties share a mistake concerning the fact. We still don't know what that fact is. We only know that the conclusory affidavits, rather brief affidavits, we have state that ConocoPhillips did not intend to waive its right to the payment of fair market value. There's no allegation concerning any mistake with regard to the PMM. Second of all, that mistake and relief must constitute a basic assumption underlying a contract, as the lower court judges in this case have reasoned, and because the PMM is so clear, because there's no allegations of the clause, that issue has at least been ambiguous, and because the oil companies are sophisticated, and because there's nothing hidden about the PMM as a public document, there's no basis to assume that anything other than the clause, as written, was the basic assumption of the contracts concerning pricing. And third, that the mistake had a material effect on the bargain. Again, the clause being so specific and so unambiguous as to what the parties, in fact, intended, the courts found no grounds, and certainly no grounds in the affidavit supply, to identify any mistake that had a material effect on the bargain. And finally, we must prove the claimant did not assume the risk of a mistake, although this was not discussed in any detail by Judge Weiss, and Gloria and Judge Hewitt said that the extent that the parties believed they needed to know more, each assumed the risk to learn more, which they certainly could have done. Neither party had superior knowledge as to the nature of the PMM. The court also has discussed waiver. We've set out in detail our argument concerning waiver, generally distinguish the case this way. We believe, as the restatement says, that there is such a thing as an illegality clause of action based on statutes that express important public policy. The Byrd case and many of his predecessors involved the National Ship Sales Act of 1946, where the Congress specifically specified the price of essentially scrap ships. Any effort to sell the ships at a different price was simply out of step with the Congress's specified intent. This court has also accredited a clause of action or found a clause of action related to illegality where other policies that are deeply ingrained in the current policies of the country, to include disclosing other contractors' bidders, contracts which are based on the court on the basis of costs plus a percentage of costs as a profit. Other variously held, variously deeply ingrained contracting policies embedded in the statutes have been fodder for this court to parties may not by agreement abrogate the law. Curiously, the Supreme Court has said pretty much any right may be waived, including the Fifth Amendment. Mr. Byrd before it refers to a situation where the parties might agree to waive Fifth Amendment rights. In fact, criminal defendants in this country waive Fifth Amendment rights all the time without any consequences. No doubt the Fifth Amendment could be waived and personal rights can be waived, but those laws that reflect deeply ingrained or congressionally stated congressional statements of national purpose may not be. Here we have a routine commercial clause probably used in commercial contracts as well. We have parties of equal sophistication. We have a clause that's not ambiguous in the least, and there's nothing to suggest this clause in one cannot be waived. Perhaps Conacher Phillips's best case is Bader. In that case, there was no waiver. Frankly, I have a hard time understanding Bader. Bader seems to talk about, well, Bader ultimately comes down to whether the defense acquisition regulation clause was followed in that case. Bader was a case where the parties first of all were required to, first of all, agreed upon forecasted prices. Any departure from the forecasted prices then entitled the adjustment. Attempting to forecast prices in the present day certainly can be grounds for a mistake, and in count three, Bader played a mistake. Bader said there's no way we can today correctly forecast where the price might be down the line, and to force us to forecast is unreasonable. They also said that they understood that, and put held, that the DARPA provision essentially was incorporated into the contract. DARPA provision required that escalation and price adjustment clauses have certain features, among others, in that particular clause, not applicable here, that the escalated prices fairly reflect the growth in the contractor's costs. I'm paraphrasing essentially. That's what it said, but by reading in that clause into the contract, and by recognizing the potential for a mistake, because the parties were required at the present time of contracting, at the time of contracting, to forecast a figure that may or may not ever occur in the future, the possibility of a mistake existed. The mistake the Bader court seems to identify is one concerning adherence to the DARPA. Here there is no allegation, there's no evidence that anybody had any question about the illegality of this clause, about the meaning of this clause, or about the meaning of PML. But there, Bader, the court seemed to be concerned that the parties actually had a live agreement, certainly one that could be fairly implied, that the clause, in fact, satisfied the DARPA. The government did not dispute that the clause did not work, and nor did the government dispute that the contractor protested immediately. It's not the significant distinction between this case and the others. So if that was a mistake case, this certainly is not. There was no present fact here about which the parties were mistaken, whereas there, there could have been, and that is the forecasted data concerning increases in price. And you ought to think about the court's jurisprudence. Your Honor, you referred to the fact that everybody seems to have a case on his or her side. Many of these cases don't refer to each other. So we can rely on the Walker case and the Whitaker case, and AT&T cites both of those, and yet we have no citation or squaring to Burt. So I'm not sure that Burt necessarily is a waiver case or stands for the proposition that there's no waiver allowed at all in this court. The other thing I suppose to keep in mind, if you're really searching for ways to distinguish these cases or understand them, is a waiver is an equitable remedy. And Ware and Berg, it certainly could be argued that the government was overbearing in its conduct and insisted that a clause that appears to have been illegal be incorporated in the contract, despite the contractor's insistence that the clause adhere to the DAR. Perhaps the equity was more on the government's side in that case. Here, whatever problem there was with the PNM could only be solved. Contractor here, ConocoPhillips, knew what its prices were, knew what its market was, knew what its ability to sell to airlines and to other customers might be, and the government was in no position to, really to, did not in fact insist on a clause to ConocoPhillips, which ConocoPhillips informed the government simply could not work or was illegal at the time. I think we've taken more than enough of the court's time. I would like to come back to the Morris case, which we were interested in, Judge Proust, and I suppose we'll address that in the context of a 12-1 motion in the Gloria case. We'll certainly give you an opportunity to do that. Thank you, Mr. Gilliam. Now, Mr. Berg, we shouldn't deprive you of your entire rebuttal, so we'll give you a couple minutes if you have anything that you need to respond to. Thank you, and I'll be brief. I principally want to comment about the state of the record on the PNM. Much of what the government talked about is the distinctions between plaques and PNM. The government acknowledged was outside the record. Much, if not most, of that we simply disagree with. The motions here are on a motion to dismiss. We've alleged that fundamentally the PNM does not reflect the marketplace. We would welcome the opportunity to put on all of our evidence about whether the PNM does or does not reflect the marketplace. What we do have in the record here, however, is that the industry widely uses plaques now to set prices, and the government now uses plaques to set prices. So in a broader sense, does plaques pass the market test? Well, the market is using it, and no one is using the PNM right now. Again, we would welcome the opportunity to explain in detail why the PNM does not work, but I do think for purposes of this record, we've established that in terms of resolving the review of the lower court's motion, that it fundamentally does not reflect the marketplace. I would also make the point that the government makes reference to, well, the ConocoPhillips knew everything it needed to know about the PNM when it entered the contract. We're here in this courtroom right now fundamentally disagreeing about what the PNM is with the government, whether it reflects the marketplace or not. I don't think in any meaningful sense on this record that the lower court's finding on a motion to dismiss that ConocoPhillips must have known everything it needed to know about the PNM when it entered the contract is supportable. It's an issue that we continue to dispute even today. So once again, I think fundamentally, we would ask that the record control here, and I think the record is pretty simple, the PNM is fundamentally alleged to not reflect the marketplace, and we're happy to address the merits of those issues and the counsel the case is submitted.